*226 OPINION.
Sternhagen :
This appeal involves the war profits and excess profits tax imposed by the Bevenue Act of 1918. The plan of that tax, as is now well known, was to tax business profits in excess of what Congress regarded as a normal standard. The standard adopted- was the average annual earnings of the taxpayer for the three years 1911, 1912, and 1913, those being the most recent years not affected by the war, when it might be assumed generally that business was going along its normal course. The earnings of a trade or business during that peacetime period were believed to reflect a fair return upon its invested capital, and the extent to which its profits exceeded such return became the measure of its excess profits and war profits tax. This plan was accomplished- (omitting details) by applying the so-called pre-war net income as .a credit against the net income for the taxable year and treating the remaining income as war profits subject to the profits tax. Thus the amount to be taken as the pre-war net income seriously affects the amount of the profits tax and is of substantial importance. If the amount of pre-war income is low, its credit may leave a large amount of net income for the taxable year to be subjected to the profits tax; and conversely, a high credit for pre-war net income proportionately reduces the taxable profit. The income tax, which is a simple percentage of the total net income, is in any event applicable and is not now a part of this consideration.
The foregoing was the plan in the case where the corporation taxpayer was in existence during the entire period of three pre-war years. If a corporation was only in existence one or two of the three years, its credit was computed upon the net income of such full prewar years as it was in existence. If, however, the corporation of the taxable year was carrying on a business which had been in existence during the entire pre-war period but during that period had been reorganized, the net income of the business for the entire pre-war period should nevertheless be used in computing the credit. And so it can be understood why it is significant to determine whether the business carried on by the taxpayer during the taxable year 1918 was *227 the same trade or business after the reorganization as was carried on in another form during the pre-war period.
For greater precision .we quote the material portions of the Revenue Act of 1918.
Sec. 310. That as used in this title the term “ pre-war period ” means the calendar years 1911, 1912, and 1913, or, if a corporation was not in existence during the whole of such period, then as many of such years during the whole of which the corporation was in existence.
Sec. 311. (a) That the war-profits credit shall consist of the sum of:
(1) A specific exemption of $3,000; and
(2) An amount equal to the average net income of the corporation for the pre-war period, plus or minus, as the case may he, 10 per centum of the difference between the average invested capital for the pre-war period and the invested capital for the taxable year. * * *
Sec. 330. That in the case of the reorganization, consolidation, or change of ownership after January 1, 1911, of a trade or business now carried on by a corporation, the corporation shall for the purposes of this title be deemed to have been in existence prior to that date, and the net income and invested capital of such predecessor trade or business for all or any part of the prewar period prior to the organization of the corporation now carrying on such trade or business shall be deemed to have been the net income and invested capital of such corporation. If such predecessor trade or business was carried on by a partnership or individual the net income for the pre-war period shall, under regulations prescribed by the Commissioner with the approval of the Secretary, be ascertained and returned as nearly as may be upon the same basis and in the same manner as provided for corporations in Title II, including a reasonable deduction for salary or compensation to each partner or the individual for personal services actually rendered. * * *
In the present case it appears as a fact that the gross sales of the partnership in the lamp business were, for the year 1911, the last full year of its existence, abbut $479,000, and those of the corporation for 1913, the first full year of its existence, were $3,871,000 — eight times as large. The question is whether the standard for the computation of its taxable war profits shall be the comparatively low average of the combined pre-war net income of the partnership and the corporation or the net income for the single year 1913, that being the only full year of the pre-war period after the organization of the corporation. This depends upon whether the business of the taxpayer in 1918 was in substance in existence during all of the prewar period, having since 1910 merely experienced a reorganization, consolidation or change of ownership, or whether it was a different trade or business which came into existence after the beginning of the pre-war period. It is not a question whether as a matter of law the corporation was the successor of the partnership, as clearly, as conceded by the taxpayer, it was, but whether the succession was in the same trade or business.
In determining this question the facts in the record before us must be controlling, and they convince us that the trade or business of the taxpayer in 1918 was substantially different from that carried on by the former partnership. Not only was the manufacture and sale of electric motors, generators, and starters an entirely different enterprise from the manufacture of carriage lamps; it had to be different. The lamp business at Amesbury, carried on as it was in a small village far from the market, without labor supply, and serving an economic need that was manifestly passing, could not long’ survive. The members of the partnership were sagacious enough to realize this promptly and *228 courageous enough to act upon it. The attempt was not to adjust an antiquated business to new demands and reorganize it. A new venture was sought and found; and when it was believed to be commercially sound, a corporation was formed and capital secured to establish it. But it had nothing to do with the lamp business. The fact that the lamp business was taken into the corporation can not be controlling, for that was only an incident of the new scheme, carried along until its necessary abandonment in 1922. From the time of the corporation’s organization its business was many times in volume that of the Amesbury business and this was due not to the long established lamp trade, its customers, credit, location, or other good will, but to the mechanical perfection and commercial practicability of the new article.
In view of the facts as they appear it would be unjust to adopt as the standard of profit for this business the earnings of the lamp business. Even to take the earnings of the first full year of the existence of the new business as the norm of profit is an artificial formula, and conceivably in many instances would lead to an artificial result. But in constructing plans for revenue, especially for war finance, Congress has the right in its legislative wisdom to adopt an artificial formula, and when it does so the formula must be applied with whatever individual hardship it may involve. The statute clearly requires that the full years of the taxpayer during the pre-war period shall be used, and no exception is made in cases where the taxpayer is engaged in an infant industry; so there is no escape from the use of the 1913 earnings. Beyond this the statute is not compelling, and we "think the adoption of the earnings of both organizations for the entire pre-war period of 1911, 1912, and 1913, as has been done by the Commissioner, is not warranted by law and must be disapproved.